### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JLK Construction, LLC, | ) | Case No. 23-50034 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | |
| JLK Construction, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 23-4030 |
| | ) | |
| Alva Advance, LLC, | ) | |
| Jared Leff, | ) | |
| SKD Holdings, LLC | ) | |
| Boost Capital Group, LLC and | ) | |
| Zac Bena | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR LEAVE TO AMEND

Plaintiff JLK Construction, LLC filed the second amended adversary complaint [Dkt. No. 80] against several defendants, asserting ten counts under state and federal law. Defendants Alva Advance, LLC; Jared Leff; and SKD Holdings, LLC filed a motion to dismiss plaintiff JLK's second amended complaint against them. The movants argue the complaint fails to state claims under all counts because the allegations do not enable the court to draw the reasonable inference that the defendants are liable for the misconduct alleged. JLK resists and requests leave to amend any count the court dismisses.

Because the court determines JLK still does not make sufficient allegations in the third iteration of its complaint, the court DISMISSES all counts. Amending counts one through four and ten would be futile, so the court DISMISSES those counts WITH PREJUDICE. But the court GRANTS JLK's request for leave to amend counts five through nine.

## BURDEN OF PROOF

The defendants bear the burden to establish that all challenged counts of JLK's second amended complaint are legally insufficient. *See Gill Constr., Inc. v. 18th & Vine Auth.*, No. 05-0608-CV-W-SOW, 2006 WL 8438149, at *1 (W.D. Mo. July 11, 2006) (assigning burden to party requesting dismissal under Rule 12(b)(6)).

## BACKGROUND

The court derives the following background information from the second amended complaint and attached exhibits, statements counsel for each party made at oral argument, and the record in this adversary proceeding and JLK's chapter 11 bankruptcy case.[1]

Plaintiff JLK is an excavation, dirt-moving, and concrete flatwork business.[2] Alva provided funds to JLK through a series of merchant cash advance (MCA)

---

[1] The court derives facts from public records relating to JLK's bankruptcy and this adversary proceeding only to the extent those facts do not conflict with the complaint and only to provide relevant background information. *See Blakley v. Schlumberger Tech. Corp.*, 648 F.3d. 921, 931 (8th Cir. 2011) ("In addressing a motion to dismiss under Federal Rule of Civil Procedure 12(b), the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record." (internal quotation marks omitted)); *Z.J. v. Kansas City*, No. 4:15-cv-00621-FJG, 2016 WL 4126569, at *3 (W.D. Mo. Aug. 2, 2016) ("[S]ome materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss." (citation omitted)).

[2] *See* Third Am. Disclosure Statement at 6, *In re JLK Construction, LLC*, No. 23-50034 (Bankr. W.D. Mo. Feb. 8, 2024), Dkt. No. 375.

transactions. JLK alleges that SKD Holdings managed Alva[3] and Jared Leff is Alva's founder and CEO.[4] JLK alleges that defendant Boost Capital Group, LLC (Boost) solicited and brokered transactions for Alva and others who are not defendants in this adversary proceeding.[5] JLK alleges defendant Zac Bena is an employee of Boost.[6] JLK further alleges that all defendants are agents, servants, employees, co-conspirators, alter-egos and/or joint-venturers of each other.[7]

After Boost did not answer or otherwise respond to the original complaint, the clerk of court entered default against Boost on January 17, 2024.[8] Bena also has not participated in this adversary proceeding. Because Boost and Bena have not filed an answer or otherwise responded, the court will only decide whether JLK sufficiently pleads its causes of action against the movants.

This adversary proceeding arises from a series of transactions JLK and Alva entered into from July 2022 to October 2022.[9] The parties disagree about the correct characterization of their contractual relationship. The movants argue the parties' contracts were for Alva's purchase of JLK's future monetary receipts[10] (at purchase prices equaling approximately two thirds of the value of receivables Alva purportedly purchased)—a characterization that aligns with the language the contracts use to

---

[3] Second Am. Compl. 2 ¶ 4, Dkt. No. 80, July 29, 2025. The cited pleading was filed in this adversary proceeding. All subsequent citations to the record in this order refer to pleadings filed in this adversary proceeding unless otherwise noted.
[4] *Id.* at 2 ¶ 3.
[5] *Id.* at 3 ¶ 5.
[6] *Id.* at 3 ¶ 6.
[7] *Id.* at 4 ¶ 10.
[8] Clerk's Entry Default, Dkt. No. 26, Jan. 17, 2024.
[9] Second Am. Compl. 5–8 ¶¶ 16–27.
[10] Defs.' Mot. Dismiss. Second Am. Compl. 2, Dkt. No. 81, Aug. 12, 2025 ("JLK CANNOT OBTAIN A DECLARATION THAT THE AGREEMENTS ARE LOANS BECAUSE THEY ARE SALES . . . .").

describe the parties' transactions.[11]    In contrast, JLK argues that the defendants deliberately mischaracterized the contracts and that the contracts gave rise to disguised loans with effective annual interest rates "between 413% and 846%."[12] JLK further alleges that the defendants "intentionally misled [JLK] by placing on the first page of each Loan Document . . . a percentage rate ranging from . . . 16.89% to 24.30%."[13]

Between July 2022 and December 2022, JLK made several payments to Alva pursuant to the terms of the parties' contracts.[14]  JLK alleges it made these payments through "daily or weekly withdrawals from [JLK's] bank account."[15]

JLK filed a chapter 11 bankruptcy petition with this court in February 2023.[16] Alva asserts a proof of claim against JLK's bankruptcy estate,[17] including a $47,621.55 proof of claim Alva characterizes as secured by JLK's "accounts and proceeds."[18]

Several months after the petition date, JLK filed an adversary complaint against defendants Alva and Boost,[19] which the court dismissed without prejudice.[20] JLK subsequently filed a first amended complaint, asserting ten counts and adding

---

[11] *See generally* Exs. 1–5 to Second Am. Compl. (characterizing the transactions as "Sale[s] of Future Receipts").

[12] Second Am. Compl. 41 ¶ 124.

[13] *Id.* at 54 ¶ 160.

[14] *Id.* at 20 ¶ 65.

[15] *Id.* at 9 ¶ 32(c).

[16] Voluntary Pet., *In re JLK Construction, LLC*, No. 23-50034 (Bankr. W.D. Mo. Feb. 13, 2023), Dkt. No. 1.

[17] Alva Advance LLC's Proof Claim No. 3, Feb. 2, 2023.

[18] *Id.*

[19] Compl., Dkt. No. 1, Oct. 25, 2023.

[20] Order Granting Def.'s Mots. Dismiss and Granting Pl.'s Mot. Leave Amend, Dkt. No. 56, July 26, 2024.

new defendants.[21]    After the court dismissed all counts of the first amended complaint,[22] JLK filed the present second amended complaint, again asserting ten counts.    In count one, JLK seeks a declaratory judgment that the transactions it entered into with Alva were disguised loans.[23]  In count two, JLK asserts a claim for usury against Alva.[24]  In count three, JLK asserts a cause of action for fraud against Alva, Leff, Boost and Bena.[25]  In count four, JLK asserts a cause of action against all defendants for violation of the Racketeer Influence and Corrupt Organizations Act (RICO). [26]  In counts five, six, seven, and eight, JLK seeks avoidance and recovery of the transfers it made to Alva as allegedly preferential and fraudulent under federal and state avoidance laws, though JLK does not specify which defendants it asserts count seven against.[27]  And finally, in counts nine and ten, JLK objects to Alva's Proof of Claim No. 3 under 11 U.S.C. § 502(d) and (b)(1), respectively.[28]

The movants ask the court to dismiss all counts of JLK's second amended complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[29]

Having summarized the relevant background information, the court turns to the merits of the present motion to dismiss.

---

[21] First Am. Compl., Dkt. No. 60, Aug. 16, 2024.
[22] Order Granting Defs.' Mots. Dismiss and Granting Pl.'s Mot. Leave Amend, Dkt. No. 79, June 30, 2025.
[23] Second Am. Compl. 8–18 ¶¶ 28–56.
[24] *Id.* at 18–26 ¶¶57–79.
[25] *Id.* at 26–32 ¶¶ 80–98.
[26] *Id.* at 32–43 ¶¶ 99–132.
[27] *Id.* at 43–75 ¶¶ 133–213.
[28] *Id.* at 75–82 ¶¶ 214–234.
[29] Defs.' Mot. Dismiss. Second Am. Compl., Dkt. No. 81, Aug. 12, 2025.

## ANALYSIS

Rules 8(a)(2), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, which apply to this adversary proceeding under Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure, govern the movants' request for dismissal.   Rule 8(a)(2) requires a plaintiff to include in its complaint "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief."   Fed. R. Civ. P. 8(a)(2). Additionally, when a plaintiff states a claim for fraud, Rule 9(b) requires that the plaintiff "state with particularity the circumstances constituting fraud," except that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."   Fed. R. Civ. P. 9(b).   To sufficiently plead fraud under Rule 9(b), the plaintiff "must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006); *see also Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972–93 (11th Cir. 2007) (discussing Rule 9(b)).

Rule 12(b)(6) empowers parties to file motions to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a complaint must include sufficient factual content to "state a claim to relief that is plausible on its face."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   A complaint states a facially plausible claim if the alleged facts provide the defendant with "'fair notice' of the nature of the claim,

[and the] 'grounds' on which the claim rests." *See id.* at 555 n.3 (construing Fed. R. Civ. P. 8(a)(2)). Under this standard, the court should not dismiss a complaint under Rule 12(b)(6) if the facts pled enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the complaint lends itself to "at least one plausible reading [that] 'allows the court to draw the reasonable inference that the defendant is liable,'" the court should not dismiss the complaint. *Norfolk & Dedham Mut. Fire Ins. Co. v. Rogers Mfg. Corp.*, 122 F.4th 312, 316 (8th Cir. 2024) (quoting *Iqbal*, 556 U.S. at 678).

The court takes a multistep approach to determining whether the complaint states a facially plausible claim. *See, e.g., Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (setting forth the three-step test). First, the court must determine the elements of each cause of action in the complaint. *Id.* Next, the court must consider all allegations together, accept them as true, and construe them in favor of the plaintiff. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (construing *Iqbal*, 556 U.S. at 678–79); *Kulkay v. Roy*, 847 F.3d 637, 641 (8th Cir. 2017) (requiring court to construe allegations in favor of plaintiff). But the court may disregard "formulaic recitation[s] of the elements of a cause of action," *Braden*, 588 F.3d at 594 (citations omitted), and need not accept any allegations that amount to mere "conclusory statements" or "legal conclusion[s] couched as [] factual allegation[s]." *Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 225–26 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). "In addition, some factual allegations may be so indeterminate that they require 'further factual enhancement' in order to state a

claim." *Braden*, 588 F.3d at 594 (citations omitted).  Finally, the court must analyze

each count independently to determine whether the complaint states a viable claim

for each element of each cause of action.  *See, e.g.*, *Santiago*, 629 F.3d at 130

(analyzing each count individually to "determine whether they plausibly give rise to

an entitlement for relief" (citation omitted)).

Applying the above standards, the court will analyze all counts of JLK's second

amended complaint below.

## I.    Declaratory Relief

JLK seeks a declaratory judgment determining that the transactions it entered

into with Alva give rise to loans and not sales of receivables.  JLK, however, again

fails to plead sufficient facts to enable the court to draw a reasonable inference that

the transactions were for disguised loans.

State law governs whether a contract creates a loan or a sale.  Under Florida

law, the parties' intent determines whether a transaction constitutes a sale or a

loan.[30]  *Indian Lake Ests., Inc. v. Special Invs., Inc.*, 154 So. 2d 883, 888 (Fla. Dist.

Ct. App. 1963) (citing *Griffin v. Kelly*, 92 So. 2d 515, 519 (Fla. 1957)); *see also Foster

v. Weber*, 578 So. 2d 857, 858 (Fla. Dist. Ct. App. 1991) ("[W]hether the parties

---

[30] Florida enacted the Florida Commercial Financing Disclosure Law (FCFDL) in 2023.  Fla. Stat.
§§ 559.961–15 (2023).  Under the FCFDL, a provider's characterization of an MCA transaction as a
sale is conclusive evidence that the transaction is not a loan. Fla. Stat. § 559.9611(1) (2025) ("For
purposes of [the FCFDL], the provider's characterization of an [MCA] transaction as a purchase is
conclusive that the . . . transaction is not a loan . . . .").  The FCFDL, however, does not govern this
court's characterization of the transactions because: (1) "the conclusive nature of a provider's
characterization of an [MCA transaction] as a purchase [is] limited in its application to . . . the FCFDL,"
*In re IVF Orlando, Inc.*, No. 6:24-bk-05475-TPG, 2025 WL 2831400, at *12 n.33 (Bankr. M.D. Fla. Oct.
3, 2025); and (2) this adversary proceeding and all the transactions at issue predate the FCFDL's
effective date.  The court, therefore, applies the law as it existed at the time of the transactions.

intended to create a loan or a sale is key to a determination whether a purchase agreement is in fact a disguised loan.").

Courts consider a variety of factors to infer the parties' intent and determine whether the transactions at issue give rise to disguised loans. At oral argument, JLK cited eight factors to support its argument that the parties intended to contract for loans, not sales. These factors are:

> (1) whether the buyer has a right of recourse against the seller;
> (2) whether the seller continues to service the accounts and commingles receipts with its operating funds;
> (3) whether there was an independent investigation by the buyer of the account debtor;
> (4) whether the seller has a right to excess collections;
> (5) whether the seller retains an option to repurchase accounts;
> (6) whether the buyer can unilaterally alter the pricing terms;
> (7) whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and
> (8) the language of the agreement and the conduct of the parties.

*See* Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 186–94 (1991). The Montana Bankruptcy Court adopted these factors in *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. D. Mont. 2021), which JLK cites in its pleadings. Similarly, in *Off. Comm. of Unsecured Creditors v. EBF Partners, LLC (In re Cornerstone Tower Servs., Inc.)*, Case No. 16-40787, Adv. No. 17-4050, 2019 WL 127359 (Bankr. D. Neb. Jan. 3, 2019), which Alva cites in its pleadings, the Nebraska Bankruptcy Court considered the following factors when analyzing MCA transactions governed by Florida law:

> 1. Language of the documents and conduct of the parties.
> 2. Recourse to the seller.
> 3. Seller's retention of servicing and commingling of proceeds.

4. Purchaser's failure to investigate the credit of the account debtor.
5. Seller's right to excess collections.
6. Purchaser's right to alter pricing terms.
7. Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets.
8. Seller's retention of right to repurchase asset.

*Id.* at *4 (quoting *Wawel Sav. Bank v. Jersey Tractor Trailer Training, Inc. (In re Jersey Tractor Trailer Training, Inc.)*, Case No. 06-12743, Adv. No. 06-2003, 2007 WL 2892956, at *7 (Bankr. D.N.J. Sept. 28, 2007) (citing Aicher & Fellerhoff, *supra*, at 186–94)).

Though no single factor is determinative, "courts place the most emphasis on the [allocation] of risk," *In re IVF Orlando, Inc.*, No. 6:24-bk-05475-TPG, 2025 WL 2831400, at *10 (Bankr. M.D. Fla. Oct. 3, 2025), a distinct "consideration that overlays and unites the factors." *In re Shoot the Moon, LLC*, 635 B.R. at 813 (citing *Off. Comm. of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Servs., Inc.)*, Case No. 16-40787, Adv. No. 17-4051, 2018 WL 6199131, at *5–*6 (Bankr. D. Neb. Nov. 9, 2018)). When analyzing risk allocation in the context of MCA transactions, "if the 'buyer' is absolutely entitled to repayment under all circumstances, then the risk remains with the 'seller' and the transaction is considered a loan." *In re IVF Orlando, Inc.*, 2025 WL 2831400, at *10 (citing *In re McKenzie Contracting, LLC*, No. 8:24-bk-01255-RCT, 2024 WL 3508375, at *2 (Bankr. M.D. Fla. July 19, 2024)). Courts analyze three primary factors to determine whether repayment is absolute (and the transaction is, therefore, more likely to give rise to a disguised loan): whether the agreement (i) is for a finite term, (ii) lacks a reconciliation provision, and (iii) entitles the purported buyer to recourse in the event

of bankruptcy or a default. *Id.* (citations omitted).  Though not determinative, the lack of an enforceable reconciliation provision (i.e., a provision that requires the purported buyer to refund amounts debited in excess of the receivables actually collected) under the second factor is key because "[w]hen a true reconciliation provision exists, and reconciliation actually occurs, this factor would support a finding of a true purchase of receivables rather than a disguised loan." *In re McKenzie Contracting, LLC*, 2024 WL 3508375, at *2.  And under the third factor, broad events of default making payment absolute or noncontingent, such as bankruptcy or nonpayment, are indicative of a loan.  *See, e.g.*, *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 456 (S.D.N.Y. 2022) (discussing provision defaulting seller after three missed payments); *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312–13 (N.Y. App. Div. 2020) (discussing recourse in event of merchant bankruptcy as indicative of a loan).  Overall, "the economic substance of the transaction controls th[e court's] determination." *In re McKenzie Contracting, LLC*, 2024 WL 3508375, at *2.

Here, rather than adopting any specific multifactor approach, the court assumes JLK's allegations are true and analyzes the economic substance of the transactions, focusing on risk allocation.  Specifically, below, the court analyzes the structure of the transactions, the events of default, and the available remedies to determine whether JLK adequately alleges that it bore the risk of loss.

## A. Structure of the Transactions

The basic structure of JLK's transactions with Alva is that JLK received a

11

lump sum payment upfront (the Net Funds Provided) to sell a specified percentage of its receivables (the Receivables Purchased Amount).[31]   In exchange, Alva made daily withdrawals (the Initial Estimated Payment)[32] from JLK's bank account via ACH debit.   Alva debited a specified daily amount until the Receivables Purchased Amount[33] was satisfied or until JLK paid off the remaining balance.

JLK admits the MCA agreements include reconciliation provisions.  But JLK argues they are illusory.  The reconciliation provisions require JLK to provide Alva with written notice of the request, JLK's login and password for the bank account, and all bank statements covering the period from the date of agreement to the date of request.   If JLK's request lacks proper documentation, the agreements do not require Alva to reconcile.  Because JLK's bank only issues monthly statements, JLK argues it could only have sought monthly reconciliations.  In other words, because JLK could only have provided bank statements at the end of the month, JLK argues the reconciliation procedures impose an effective time limit on JLK's right to request reconciliation.   Additionally, rather than reconciling, JLK alleges that Alva would make new "loans" to JLK to pay off the remaining balance on the prior "loan."  JLK argues that the contracts transfer no risk of loss to Alva because the agreements give JLK limited opportunities to exercise JLK's reconciliation rights and no opportunities to adjust future payments without Alva's consent.

JLK's allegations that the reconciliation provisions are illusory appear to

---

[31] Ex. 1 to Second Am. Compl. 1; Ex. 2 to Second Am. Compl. 1; Ex. 3 to Second Am. Compl. 1; Ex. 4 to Second Am. Compl. 1; Ex. 5 to Second Am. Compl. 1.
[32] *Id.*
[33] *Id.*

mischaracterize the terms of the agreement.  Specifically, the contracts do not give Alva discretion to deny reconciliation; they provide that if JLK provides proper documentation supporting its request for reconciliation, then "ALVA *will* credit to the Account all amounts to which ALVA was not entitled."[34]  Moreover, JLK's argument that the agreements impose a time limit on JLK's right to request reconciliation is unpersuasive.  The specific language in the reconciliation provisions requires JLK to provide "*any and all* [bank] statements"—implying that JLK would not have to provide a statement the bank has not yet issued.[35]  The contracts support this implication because they do not use the words "month" or "monthly," or impose any other limit on JLK's right to request reconciliation.  In fact, the contracts provide that "[n]othing herein limits the amount of times that a reconciliation may be requested or conducted."[36]  Additionally, JLK's principal signed a Declaration of Ordinary Course of Business, which states, "[JLK is] aware of [JLK's] right to request a reconciliation of the payments made under the Agreement *at any time*."[37]  Finally, though reconciliation never actually occurred, JLK makes no allegations that it ever requested a reconciliation or that Alva ever denied any request for a reconciliation. Thus, the court cannot accept as true JLK's bare, conclusory statement that the reconciliation provisions are illusory.

Without additional factual enhancement, JLK fails to allege that the structure

---

[34] *See, e.g.*, Ex. 1 to Second Am. Compl. 3 § 4 (emphasis added).
[35] *Id*. at 2 § 4 (emphasis added).
[36] Ex. 1 to Second Am. Compl. 3 § 4; Ex. 2 to Second Am. Compl. 3 § 4; Ex. 3 to Second Am. Compl. 3 § 4; Ex. 4 to Second Am. Compl. 4 § 4; Ex. 5 to Second Am. Compl. 4 § 4.
[37] *See, e.g.*, Ex. 1 to Second Am. Compl. 21 (emphasis added).

of the transactions makes them more likely to create loans than sales.

### B. Events of Default

JLK also fails to plead any broad event of default that makes repayment absolute or otherwise identify an event of default in the contracts that keep the risk of loss with JLK. JLK does not identify any provision in any of the MCA agreements that trigger a default in the event of nonpayment or bankruptcy. Indeed, the agreements specifically say, "Any Merchant going bankrupt or going out of business or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement."[38] Thus, under the terms of the contracts, it appears that nonpayment or filing for bankruptcy, without additional actions or failures to act, do not trigger a default.

Nevertheless, JLK asserts it was in default from the inception of the transactions. Specifically, JLK alleges that Alva knew JLK was in breach of the warranty not to engage in "stacking" by selling the receivables it sold to Alva more than once. As part of the transactions, JLK represented that "it [would] not enter into with any party other than ALVA any arrangement, agreement, or commitment that relates to or involves the Receivables . . . without the prior written consent of ALVA."[39] Despite this warranty, following JLK's July 25, 2022, transaction with Alva, JLK quickly entered into three additional MCA agreements: (1) a July 28, 2022, transaction with EIN Cap; (2) a July 29, 2022, transaction with FFCG; and (3) an

---

[38] Ex. 1 to Second Am. Compl. 4 § 15; Ex. 2 to Second Am. Compl. 4 § 15; Ex. 3 to Second Am. Compl. 4 § 15; Ex. 4 to Second Am. Compl. 5 § 15; Ex. 5 to Second Am. Compl. 5 § 15.
[39] *See, e.g.*, Ex. 1 to Second Am. Compl. 7 § 30 (describing "stacking" warranty).

August 8, 2022, transaction with GFE.   Boost brokered all four transactions (including JLK's transaction with Alva) over a period of only two weeks.   JLK claims that "[t]hese [three subsequent] transactions were contemplated when ALVA made its July 25, 2022, loan."[40]   Thus, by breaching the "stacking" warranty, JLK was allegedly in default from the outset,[41] triggering Alva's right to remedies.[42]   These remedies include the "full uncollected Receivables Purchased Amount plus all fees due under this Agreement," which would be "due and payable in full immediately."[43] Because failing to trigger these remedies or failing to declare JLK in default would not, under the agreements, waive Alva's rights,[44] JLK was allegedly "in a perpetual state of default," ensuring payment was absolute and that no risk of loss transferred to Alva.[45]

Like its arguments regarding the reconciliation provisions, JLK's allegations that it was in default from the beginning of the first agreement and thus bore the risk of loss appear to mischaracterize the terms of the agreements.   Section 30 of the agreements provides that JLK "represents, warrants, and covenants that it *will* not enter into with any party other than ALVA any arrangement, agreement, or commitment that relates to or involves the Receivables . . . without the prior written

---

[40] JLK Construction Inc.'s Opp'n Defs.' Mot. Dismiss Second Am. Compl. ("JLK's Opp'n Mot. Dismiss") 8, Dkt. No. 84, Sept. 5, 2025.

[41] *See, e.g.*, Ex. 1 to Second Am. Compl. 7 § 34(1) (describing an intentionally false or materially misleading warranty as an "Event of Default").

[42] *See, e.g.*, Ex. 1 to Second Am. Compl. 5, 8 §§ 17, 35 (describing Alva's "protections against default" and "remedies").

[43] Ex. 1 to Second Am. Compl. 5 § 17 (detailing "Protection 1").

[44] Ex. 1 to Second Am. Compl. 10 § 50 ("No failure on the part of ALVA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof . . . .").

[45] Second Am. Compl. 16 ¶ 51.

consent of ALVA."[46]  This warranty, despite JLK's allegations, is not a representation of current intent (i.e., it is not a representation that, at the time of contracting, JLK did not intend to "stack" receivables).  Instead, the representation is one of future conduct, which JLK cannot falsely represent before the conduct occurs.  To clarify this point, the court provides the following illustration.  At the time of the July 25, 2022, transaction, it may have been true that JLK knew it would enter into several more MCA agreements.  And thus, JLK could have intended to "stack" receivables on July 25, 2022.  However, JLK would not be in breach of the "stacking" warranty until it entered into the EIN Cap transaction on July 28, 2022, without Alva's written consent.  This conclusion is supported by the fact that Alva could have provided written consent to JLK's future transactions, allowing JLK to prevent a breach.  Therefore, JLK was not and could not have been in breach from the outset, and JLK's alleged intent to stack receivables at the time of contracting alone did not place it in a "perpetual state of default."

Accordingly, JLK has not sufficiently identified an event of default under the agreements that render payment absolute or keep the risk of loss with JLK.

### C. Remedies

JLK lists several remedies under the MCA agreements that JLK describes as "hallmarks of a loan," including acceleration clauses, guarantees, security agreements, attorney fee shifting provisions, rights of assignment, and other remedies.[47]  Though these allegations may support JLK's characterization of the

---

[46] *See, e.g.*, Ex. 1 to Second Am. Compl. 7 § 30 (emphasis added).
[47] Second Am. Compl. 13–14 ¶ 48(a)–(i) (listing "hallmarks of a loan").

contracts as loans, they do not alone justify the characterization JLK proposes because JLK fails to connect the remedies to sufficiently broad events of default[48] that trigger them.  Thus, without more, the alleged remedies are insufficient for JLK to successfully plead that it bore the risk of loss and that the contracts give rise to loans.

Because JLK fails to sufficiently allege that the (1) structure of the transactions, (2) events of default, and (3) remedies keep the risk of loss with JLK, JLK fails to adequately plead that the transactions give rise to disguised loans. Accordingly, the court DISMISSES JLK's declaratory relief count WITH PREJUDICE.

## II.   Usury

JLK also seeks a judgment against Alva for violating Florida usury law by allegedly charging excessive interest rates under the MCA agreements.  Because JLK fails to adequately plead that the MCA transactions at issue gave rise to loans, JLK does not sufficiently plead its usury count.

Under Florida law, an interest rate exceeding 18% can be civilly usurious.  Fla. Stat. § 687.03(1) (2022).[49]  To allege usury, the plaintiff must plead four elements: (1) the existence of a loan; (2) an understanding that the money lent is to be returned;

---

[48] *See supra* Section I.B (discussing JLK's failure to sufficiently allege events of default that keep the risk of loss with JLK).

[49] In its second amended complaint, JLK cites Florida's criminal usury statute, Fla. Stat. § 687.071 (2022).  *See* Second Am. Compl. 25 ¶ 75.  While § 687.071 provides borrowers a "statutory cause[] of action . . . to seek affirmative relief against a lender who has made a usurious loan," *Velletri v. Dixon*, 44 So. 3d 187, 189 (Fla. Dist. Ct. App. 2010), § 687.071 applies to loans exceeding $500,000.  *Oregrund Ltd. P'ship v. Sheive*, 873 So. 2d 451, 456 (Fla. Dist. Ct. App. 2004) ("[F]or loans under $500,000, a usurious contract is present if an interest rate exceeds 18%. Sections 687.02(1), 687.03(1). But for loans exceeding $500,000 the operative statute is section 687.071.").  Because none of the MCA transactions exceed $500,000, the court analyzes usury under § 687.03(1).  *See generally* Exs. 1–5 to Second Am. Compl. (listing "Receivables Purchased Amount" of $119,350 up to $193,685).

(3) an agreement to pay interest exceeding the usury cap; and (4) a corrupt intent. *Dixon v. Sharp*, 276 So. 2d 817, 819 (Fla. 1973). The fourth element is key. As the Florida Supreme Court emphasized, "usury is largely a matter of intent." *Id.* at 820. To allege a corrupt intent, the plaintiff must do more than just allege that the defendant received more than the usury interest rate. *Id.*; *see also Vision Dev. Grp. of Broward Cnty., LLC v. TMG Sunrise, LLC (In re Vision Dev. Grp. of Broward Cnty., LLC)*, 411 B.R. 768, 773 (Bankr. S.D. Fla 2009) (discussing how plaintiff cannot rely on the court to derive intent from mathematical calculations). The plaintiff must "specifically and affirmatively plead[]" that the defendant possessed "an improper motive in his mind to get more than the legal interest." *Dixon*, 276 So. 2d at 821 (quoting *River Hills, Inc. v. Edwards*, 190 So. 2d 415, 423 (Fla. Dist. Ct. App. 1966)). Ultimately, "the question of intent is to be gathered from the circumstances surrounding the entire transaction." *Id.*

Because JLK has not adequately pled that the transactions gave rise to loans,[50] it fails to plead the first element of usury under Florida law. Therefore, the court DISMISSES JLK's usury count WITH PREJUDICE.[51]

---

[50] *See supra* Part I.

[51] Beyond their argument that the agreements were not loans and thus did not impose an interest rate that could be usurious, the defendants also argue that the alleged loans were not usurious because (1) repayment is subject to a contingency, *see In re Transcapital Fin. Corp.*, 433 B.R. 900, 907 (Bankr. S.D. Fla. 2010); and (2) because there is no interest rate, there can be no corrupt intent to collect a usurious rate. Though the defendants' additional arguments could compel dismissal at the summary judgment stage, they weigh on the ultimate issue of whether the transactions were disguised loans. Whether Alva's repayment is contingent depends on the allocation of risk between the parties, and whether an interest rate can be calculated depends on whether the contract has a finite term. Thus, the court limits its analysis to whether JLK adequately pled the existence of a loan, which it did not.

## III.   Fraud

Now on its third attempt to plead fraud with particularity, JLK again fails to articulate a cohesive cause of action and premise it on concrete factual allegations. In essence, JLK theorizes that all defendants schemed to induce JLK to sign, without reviewing, MCA agreements that JLK interprets as disguised usurious loans.  But rather than pleading all elements of one theory with particularity, JLK makes arguments that partially plead at least two theories and substitutes conclusory legal characterizations for the specific factual allegations Rule 9(b) demands.  The court analyzes below each of the theories JLK arguably attempts to plead: (A) fraudulent concealment and (B) conspiracy (either as a conspiracy to commit another tort or unlawful act or civil conspiracy as an independent tort).  For the reasons the court will explain, it determines that no matter how the court construes this count, it fails. Consequently, the court DISMISSES this count WITH PREJUDICE.

### A. Fraudulent Concealment

JLK again titles its third claim for relief "Fraud" without specifying the theory of fraud it pleads. In its response in opposition to the movants' motion to dismiss the second amended complaint, however, JLK initially characterizes this count as a claim for "Fraud – Concealment."  Thus, the court begins by analyzing whether JLK sufficiently pleads fraudulent concealment. The court concludes, for the reasons explained below, JLK's pleading of this count does not satisfy Rule 9(b).

As the court explained in its prior orders,[52] to state a claim for fraudulent concealment under Florida law, the plaintiff must plead with particularity the following five elements:

> (1) the defendants concealed or failed to disclose a material fact; (2) the defendants knew or should have known the material fact should be disclosed; (3) the defendants knew their concealment of or failure to disclose the material fact would induce the plaintiffs to act; (4) the defendants had a duty to disclose the material fact; and (5) the plaintiffs detrimentally relied on the misinformation.

*Garrett-Alfred v. Facebook, Inc.*, 540 F. Supp. 3d 1129, 1138 (M.D. Fla. 2021) (citation modified) (citing *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015)).

The first and fourth elements merit additional explanation. The nondisclosure or concealment under the first element must be of a material fact, "not a debatable legal opinion on a complex legal matter." *C.f. Chino Elec., Inc. v. U.S. Fid. & Guar. Co.*, 578 So. 2d 320, 323 (Fla. Dist. Ct. App. 1991) (determining a representation that the statute of limitations had expired was simple enough of an issue to be "in effect, a factual assertion"). And under the fourth element, the defendants must have failed to disclose or intentionally suppressed the fact while under a duty to disclose it. *See Garrett-Alfred*, 540 F. Supp. 3d at 1138 (listing elements); *In re Lichtman*, 388 B.R. 396, 410 (Bankr. M.D. Fla. 2008) (explaining fraudulent concealment is viable "if the defendant intentionally suppresses material facts"). A duty to disclose may arise "when one party [to the contract] has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them."

---

[52] Order Granting Def.'s Mots. Dismiss and Granting Pl.'s Mot. Leave Amend 26–27, Dkt. No. 56, July 26, 2024; Order Granting Defs.' Mots. Dismiss and Granting Pl.'s Mot. Leave Amend 17, Dkt. No. 79, June 30, 2025.

*TransPetrol, Ltd. v. Radulovic*, 764 So. 2d 878, 880 (Fla. Dist. Ct. App. 2000) (quoting *State v. Mark Marks, P.A.*, 654 So. 2d 1184, 1189 (Fla. Dist. Ct. App. 1995) (internal quotation marks omitted)).  But "where the parties are dealing at arms'[] length and the facts lie equally open to both parties, with equal opportunity of examination, mere nondisclosure does not constitute a fraudulent concealment."  *Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985).

To analyze whether JLK states a facially plausible claim under this count, the court must first attempt to discern what, precisely, JLK alleges the movants fraudulently concealed or failed to disclose.  At times, it appears the allegedly undisclosed fact is the form of the contracts the movants sent JLK—i.e., that the movants sent JLK contracts JLK now interprets as disguised usurious loans (rather than the reasonable loans JLK allegedly sought),[53] or that the movants sent JLK contracts styled as sales of receivables (rather than contracts for reasonable loans).[54] Other times, it appears JLK's theory is that the movants failed to disclose JLK's legal characterization that the MCA contracts are disguised loans charging usurious

---

[53] *See, e.g.*, Second Am. Compl. 27 ¶ 84 (alleging Bena made a "lending pitch" that Boost brokered commercially reasonably loans for lenders charging reasonable interest rates), 28 ¶ 87 (stating JLK would not have agreed to such unreasonable interest rates), 30 ¶ 94 ("BENA, as agent for BOOST, acting in accord with their scheme with ALVA and LEFF, fraudulently represented to [JLK] that the interest rate chargeable for each loan was reasonable and lawful . . . ."), 31 ¶ 96 ("[JLK] justifiably relied upon representations that it would be obtaining a loan.").

[54] *See, e.g.*, Second Am. Compl. 28 ¶ 86 ("Mr. Kagarice did not know a merchant cash advance ('MCA') was not a loan."), 29 ¶ 90 ("[JLK] was never informed prior to entering any of the agreements that there would be no interest rate because the transaction was a purchase of receivables.  Moreover, BOOST and BENA knew that [JLK] believed it was receiving a loan with legal interest and in accord with their scheme devised by ALVA, LEFF and others, withheld and did not disclose the transaction was not a loan, but a purchase of receivables."), 31 ¶ 95 ("ALVA, knew or should have known that the Loan Documents facially claimed to be a purchase of receivables contrary to the negotiations with [JLK] . . . ."); JLK's Opp'n Mot. Dismiss 21 ("JLK's fraud claim alleges a concealment of the nature of the transaction documents . . . .").

21

imputed interest rates (a characterization the movants vehemently contest).[55]  And in at least one instance, JLK appears to argue the movants failed to disclose the movants' allegedly fraudulent intent.[56]

But no matter how the court construes the alleged nondisclosure, JLK does not sufficiently plead that the movants concealed or failed to disclose an actionable fact under the first element or had a duty to disclose under the fourth element.

First, JLK does not plead that the movants concealed or failed to disclose a material fact under the first element.  The movants did not conceal the form of the MCA agreements.   Instead, the MCA agreements speak for themselves and inherently disclose the form of the contracts JLK received (regardless of the correct interpretation of that form).  Thus, even if the court attributed to the movants Bena's alleged statement that Boost brokered reasonable "loans," the movants' subsequent provision of the MCA agreements constituted disclosure and would cure Bena's alleged misstatement.   The court cannot, therefore, conclude that the movants "concealed or failed to disclose" what Alva was offering JLK.  JLK also cannot satisfy this element by premising its claim on the movants' alleged failure to disclose that the transactions gave rise to disguised usurious loans or the failure to disclose the

---

[55] *See, e.g.*, Second Am. Compl. 11 ¶ 39 ("Defendants, and each of them, intentionally failed to disclose a material term of the Loans by failing to disclose the interest rate that the Defendants charged to [JLK] by fraudulently labeling the loan a sale of 'future receipts.'"), 29 ¶ 88 ("[T]he scheme included rushing execution of online documents *to avoid disclosures regarding the distinction* between a loan and a purchase of future receivables . . . ." (emphasis added)), 29 ¶ 89 ("[W]ithout disclosing that it was charging an interest rate between 1.24% and 2.32% daily, or an imputed annual interest rates between 413% annually and 846% annually . . . ."), 30 ¶ 93 ("Had [JLK] known the truth that the agreements purported to be sales of receivables at extremely high rates of return far in excess of any legal interest imposed by a lawful loan, it would never have entered the transactions.").

[56] JLK's Opp'n Mot. Dismiss 20 ("Defendants knew that they were tricking JLK into a sale transaction. . . . [A] duty arose to inform JLK of the intent of the agreement.").

movants' allegedly fraudulent intent.  Both allegedly undisclosed facts amount to highly debatable opinions on complex legal matters and, therefore, are not actionable under Florida law.

JLK also does not sufficiently allege that the movants had a duty to disclose under the fourth element.  JLK's theory appears to be that, though these are arms'-length transactions, the defendants' joint efforts to discourage JLK's review of the MCA agreements created a duty to disclose the nature of those agreements.[57]  But JLK's allegations about discouragement[58] and arguments that JLK signed at least one of the agreements soon after receiving it[59] are insufficient to plead that any defendant prevented JLK from reviewing the documents before signing them.  This is not a case involving a seller's failure to disclose a known latent defect in a product.[60]

---

[57] There is at least one threshold issue with this theory: it requires the court to accept JLK's premise that the MCA agreements were not what they purported to be (a legal determination the court declines to make for the reasons it explained in the declaratory judgment section above).  But even if the court disregards that threshold issue, JLK's theory fails for the reasons the court explains in this section.

[58] For example, JLK alleges, "the scheme included rushing execution of online documents to avoid disclosures regarding the distinction between a loan and a purchase . . . [and] claims of usury."  Second Am. Compl. 29 ¶ 88.  JLK also states that the movants schemed with Boost and Bena to "discourage[] any review of the transaction document and rushed [JLK] to simply sign the agreement without reading the document.  [JLK] was rushed through the process with statements about funds being ready to deposit in [JLK's] bank account for immediate use." *Id.* at 30 ¶ 91.

[59] JLK makes no concrete factual allegations about how little time its principal spent reviewing the MCA agreements in the substantive allegations of the complaint, but in its opposition to the motion to dismiss, JLK points to exhibit 12 to the second amended complaint. JLK argues, "The history provides that on October 13, 2022, the MCA Agreement was created at 3:34 pm., it was not reviewed until 4:48 pm, and it was signed by JLK's principal at 4:50 pm." JLK's Opp'n Mot. Dismiss 19.

[60] JLK has repeatedly cited *Kitchen v. Long*, 67 Fla. 72 (Fla. 1914) for the proposition that the movants had a duty to disclose the nature of the transactions.  But *Long* involved a seller who feigned ignorance concerning a mule despite knowing that the mule was defective and worthless.  Critically, "the defect in the mule . . . was one not to be discovered by ordinary observation." *Id.* at 76 ("[I]f he intentionally withholds information of the existence of defects, which are not equally within the ken of the buyer, as where poison has been spilled upon fodder, or where animals are sold for breeding purposes when the vendor knows they are impotent, it is undoubtedly a fraud." (internal quotation mark omitted)).  Here, the alleged "defect" in the contracts—to the extent it can be construed as something other than a complicated, contested legal characterization—was not hidden. *Kitchen*, therefore, does not apply.

Nothing in the second amended complaint suggests JLK lacked access to the MCA agreements or could not have taken the time necessary to review the documents. Thus, the relevant facts were equally open to both parties, who each had an equal opportunity to examine the documents. Moreover, even if JLK did not understand the nature of the financing arrangements it undertook, JLK's lack of understanding did not impose any duty on the defendants. JLK does not otherwise plead that any defendant had factual information that JLK lacked or that JLK had a right to know due to a relationship of trust or confidence. Thus, JLK does not sufficiently plead a duty to disclose, and JLK's count fails under this element.

Because JLK does not plausibly allege that the movants concealed or failed to disclose a material fact while under a duty to disclose, the second amended complaint does not state a claim for fraudulent concealment.

### B. Conspiracy

In its response in opposition to the motion to dismiss and at oral argument, JLK argued that its third count states a claim for conspiracy. At times, JLK appears to characterize its purported conspiracy count as one to commit another tort or unlawful act—presumably either fraud[61] or usury.[62] At other times, JLK argues that its third count states a claim for an independent conspiracy.[63] The court analyzes—

---

[61] *See, e.g.*, JLK Opp'n Mot. Dismiss 18 ("In addressing this issue with the Court, JLK raised an issue of conspiracy to defraud.").

[62] *See, e.g.*, *id.* at 19 (characterizing the underlying unlawful act as "to have distressed businesses enter credit agreements which were designed to recover far in excess of legal interest rates to avoid usury claims"), 20 (alleging the defendants charged interest rates above Florida's criminal usury limit, "rendering the usury . . . punishable as a felony").

[63] *See id.* at 21–22 (discussing conspiracy law and arguing "the actions of Defendants and BOOST and BENA rise to the level of an independent tort").

and rejects—both characterizations below.

To state a claim for conspiracy under Florida law, a plaintiff must allege four elements:

> (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.

*Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014) (quoting *Raimi v. Furlong,* 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)).

The "unlawful act" or "unlawful means" under the second element must be one that "would constitute a cause of action if the wrong were done by one person." *Kee v. Nat'l Rsrv. Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990). This requirement exists because (with one limited exception the court explains below) "Florida courts do not recognize civil conspiracy as an independent tort" or cause of action. *Est. of Scutieri v. Chambers*, 386 F. App'x 951, 954 (11th Cir. 2010). Instead, "conspiracy is merely the vehicle by which the underlying tort [or other unlawful act] was committed, and the allegations of conspiracy permit the plaintiff to hold each conspirator jointly liable for the actions of the coconspirators." *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. Dist. Ct. App. 2019). "[I]f there is no underlying [cause of action], there can be no conspiracy to commit the [cause of action]." *Est. of Scutieri*, 386 F. App'x at 954 (citing *Liappas v. Augioustis*, 47 So. 2d 582, 582 (Fla. 1950)). Thus, the court may dismiss a conspiracy cause of action when it dismisses all predicate claims. *Behrman v. Allstate Life Ins. Co.,* 178 F. App'x 862,

863 (11th Cir. 2006) (affirming *Behrman v. Allstate Ins. Co.*, 388 F. Supp. 2d 1346, 1351–53 (S.D. Fla. 2005) (dismissing conspiracy claims after concluding plaintiff did not sufficiently allege duty to disclose in predicate fraud count)).

There is, however, a "very narrow exception" to the general rule that conspiracy is not a viable freestanding cause of action. *Est. of Scutieri*, 386 F. App'x at 954 n.5 (quoting *Liappas,* 47 So. 2d at 583). When conspirators' combined economic or coercive power alters the fundamental nature of the allegedly conspiratorial act and enables the group to accomplish something that the individual conspirators could not have accomplished alone, "the conspiracy itself becomes the gist of the action." *Liappas*, 47 So. 2d at 582–83 (describing the tort of independent conspiracy and requiring that the character or nature of the allegedly conspiratorial act be changed by the combined action). "The essential elements of this [independent conspiracy] tort are a malicious motive and coercion through numbers or economic influence." *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977). Under this framework, Florida courts appear to most often recognize independent conspiracy causes of action when conspirators combine forces to block a person or entity from a money-making venture. *See, e.g.*, *Snipes v. W. Flagler Kennel Club, Inc.*,105 So. 2d 164, 164–65 (Fla. 1958) (reversing dismissal of conspiracy count premised on defendant racetrack owners' joint efforts to exclude plaintiff greyhound racer from the local racing industry); *Churruca*, 353 So. 2d at 550–51 (discussing examples of independent conspiracies and reversing dismissal of independent conspiracy count where defendant employers combined to prevent employment of plaintiffs who had

been on strike). But "[o]utside of [concerted deprivations of business or employment opportunities and labor disputes] and related or similar fields, instances of conspiracy which is in itself an independent tort are rare and should be added to with caution." *Liappas*, 47 So. 2d at 583 (quoting *Fleming v. Dane*, 22 N.E.2d 609, 611 (Mass. 1939)).

Though Florida conspiracy law is somewhat complex, the court's analysis of JLK's purported conspiracy cause of action is straightforward.

JLK does not adequately plead a conspiracy to commit another wrong. Under the first element, JLK makes no factual allegations supporting its conclusion that the defendants had an agreement to defraud JLK. JLK's conclusory statements that the defendants "schemed"[64] and were each other's "agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer"[65] are not concrete factual allegations that could form the basis for a substantive conspiracy claim. But more importantly, under the second element of a conspiracy to commit another wrong, because the court determined JLK does not state viable claims for fraud or usury,[66] JLK has not plausibly pled a predicate unlawful act or means. Consequently, JLK does not plausibly plead that the defendants engaged in a conspiracy to commit another wrong.

JLK likewise does not state a facially plausible claim for an independent conspiracy. JLK does not contend that the defendants' combined economic or coercive power altered the fundamental nature of their allegedly conspiratorial acts or enabled

---

[64] Second Am. Compl. 28–30 ¶¶ 88, 90, 92, 94.
[65] *Id.* at 3–4 ¶¶ 7–8, 10.
[66] *See supra* Parts II–III.A.

them to accomplish something that the individual defendants could not have accomplished alone. And JLK makes no substantive allegations that would otherwise enable the court to reasonably infer that the defendants' conduct makes them liable for an independent conspiracy. Instead, the defendants allegedly accomplished as a group something that the individuals could have accomplished alone: allegedly offering a reasonable loan but giving something else. Because the gist of JLK's cause of action is not one for independent conspiracy, this theory also fails.

In summary, JLK does not state a viable claim for fraud or conspiracy under any theory. The court DISMISSES this count WITH PREJUDICE.

## IV. Racketeering

JLK alleges the defendants engaged in racketeering under 18 U.S.C. § 1962(c) and seeks treble damages under 18 U.S.C. § 1964(c). Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

To state a claim under § 1962(c), the plaintiff must plead: (1) that the defendant committed racketeering offenses through a pattern of racketeering activity or the collection of an unlawful debt, 18 U.S.C. § 1962(c); *see also United States v. Bennett*, 44 F.3d 1364, 1374 (8th Cir. 1995) (requiring the plaintiff to establish "that the defendant's participation was through a pattern of racketeering activity"); (2) that the defendant's conduct was the proximate cause of the plaintiff's injury, *Bridge v.*

28

*Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008); and (3) that the defendant participated in the conduct of an enterprise's affairs, *Bennett*, 44 F.3d at 1374.[67]

Here, JLK alleges the defendants engaged in the collection of unlawful debts in violation of § 1962(c).  In short, JLK asserts that the transactions it entered into with Alva were disguised loans rather than sales of receivables.  And because the interest rates on the "loans" far exceeded Florida's usury cap, the defendants violated § 1962(c) by participating in the collection of the alleged unlawful loans.

But JLK fails to sufficiently plead its RICO cause of action because (1) it fails to allege that each defendant participated in the collection of unlawful debts under the first RICO element, and (2) it fails to plead that the defendants conducted the affairs of an enterprise under the third element.  Therefore, the court DISMISSES JLK's RICO count WITH PREJUDICE.

### A.  Unlawful Debt

JLK fails to plead the collection of unlawful debt because it fails to plead that the MCA transactions at issue were loans and thus fails to plead the existence of an unlawful debt.

To plead an unlawful debt based on usury under § 1962(c), the plaintiff must allege facts demonstrating that (1) the debt is unenforceable under state or federal usury laws; (2) the debt was incurred in connection with the business of lending money at a usurious interest rate; and (3) the usurious interest rate exceeds twice the enforceable usury rate under state or federal law.  18 U.S.C. § 1961(6) (defining

---

[67] Though it does not appear to be a contested issue in this adversary proceeding, a RICO plaintiff must also plead that the defendants engaged in interstate commerce.  *Bennett*, 44 F.3d at 1374.

"unlawful debt"); *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 451 (S.D.N.Y. 2022) (citing *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985)).

In Florida, a debt is unenforceable if it exceeds the usury cap of 18%. Fla. Stat. § 687.03(1) (2022). So, to plead an unlawful debt under the RICO statute, the interest rate must exceed 36%. To plead a debt was incurred in connection with the business of lending money at usurious interest rates, the plaintiff must demonstrate that the defendants did not just occasionally lend money at usurious rates, but rather, regularly entered into usurious lending agreements. *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 20-cv-5120 (LJL), 2022 WL 1997207, at *18–19 (S.D.N.Y. June 6, 2022).

For the same reasons discussed in the declaratory relief section,[68] JLK fails to sufficiently plead that the MCA transactions at issue were loans. Thus, JLK necessarily fails to plead the existence of an unlawful debt under the RICO statute.

## B. Conducted the Affairs of an Enterprise

JLK also fails to allege the defendants conducted the affairs of an enterprise because it does not sufficiently identify an "enterprise" under 18 U.S.C. § 1961(4) and does not adequately allege culpable persons distinct from the "enterprise."

RICO requires plaintiffs to plead that each defendant participated in the conduct of an enterprise's affairs. *Bennett v. Berg*, 685 F.2d 1053, 1061 (8th Cir. 1982) ("The RICO Act proscribes conduct in which one party . . . acts upon . . . the 'enterprise'

---

[68] *See supra* Part I.

. . . ."). To adequately plead this element, the plaintiff must allege an enterprise and culpable persons distinct from the enterprise. *Id.*; *see also United HealthCare Corp. v. Am. Trade Ins. Co.,* 88 F.3d 563, 570 (8th Cir. 1996) ("The enterprise must be distinct from the person named as the RICO defendant."). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). A plaintiff may plead a group of individuals associated in fact (an association-in-fact enterprise) by alleging "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States,* 556 U.S. 938, 946 (2009).

For the reasons the court will explain, JLK (1) does not sufficiently identify an enterprise, and (2) fails to allege culpable persons distinct from the enterprise. Consequently, the court does not reach JLK's allegations about how each culpable person "participated in the operation or management of the [enterprise] itself." *Reves*, 507 U.S. at 186.

### 1. JLK Does Not Adequately Plead an Association-in-Fact

In its second amended complaint, JLK now alleges an association-in-fact enterprise by describing it as an "ongoing structure consisting of the Culpable Persons and others who are associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making."[69]   The

---

[69] Second Am. Compl. 34 ¶ 108.

"Culpable Persons" are Alva, Leff, SKD Holdings, Boost, and Bena.[70]   JLK alleges

that Alva, Leff, SKD Holdings, Boost, and Bena "engaged in the common goal of

soliciting, funding, servicing, and collecting upon usurious loans."[71]   JLK also alleges

that "[t]hrough their operation of the Enterprise, ALVA, LEFF, SKD HOLDINGS,

BOOST and BENA solicited, underwrote, funded, serviced, and collected an unlawful

debt."[72]

But JLK's generic, conclusory allegations are not sufficient to adequately plead

the requirements of an association-in-fact enterprise.   Specifically, JLK fails to

sufficiently plead (1) relationships among those associated with the enterprise, and

(2) longevity sufficient to permit these associates to pursue the enterprise's purpose.

For the relationship element, JLK fails to provide key details about the

relationships between the culpable persons, such as how decisions were made and by

whom.   Mere conclusory allegations that each culpable person "had ongoing relations

with each other through common control/ownership"[73] are insufficient to meet the

relationship element.   *See, e.g., Nelson v. Nelson*, 833 F.3d 965, 969 (8th Cir. 2016)

(affirming dismissal because the plaintiff failed to allege how the defendants "formed

a 'continuing unit'" beyond "conclusory references to a joint operation" (citing *Boyle*,

556 U.S. at 948)).

For the longevity element, it is unclear when this association-in-fact enterprise

is alleged to have formed.   JLK merely declares without more that the association

---

[70] *Id.* at 33–34 ¶¶ 105–07.
[71] *Id.* at 34 ¶ 109.
[72] *Id.* at 42–43 ¶ 130.
[73] *Id.* at 34–35 ¶ 111.

has "existed over several years."[74] JLK does allege that, in 2019, Boost and Bena "continually solicited [JLK's] business, offering various lending options to [JLK]."[75] There are no allegations, however, that Alva, Leff, and SKD Holdings were involved at this point. At most, the court can infer from JLK's allegations that the association-in-fact enterprise was formed around the time the parties executed the first MCA agreement on July 25, 2022.[76] Admittedly, there is no bright-line rule regarding the amount of time required to satisfy the longevity element. *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015) ("Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989))). Being left to guess when the enterprise was formed, however, the court finds JLK's longevity allegations to be insufficient. *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1007 (E.D. Va. 2021) ("Plaintiff's allegations are insufficient because the Court is left to guess when, exactly, the enterprise took shape." (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009))).

Consequently, JLK does not adequately plead an association-in-fact enterprise.

### 2. JLK Does Not Allege Culpable Persons Distinct from the Enterprise

A RICO plaintiff, in addition to alleging an enterprise, must also identify the defendants as "culpable persons" distinct from the enterprise. *Bennett v. Berg*, 685

---

[74] JLK's Opp'n Mot. Dismiss 26.

[75] Second Am. Compl. 8 ¶ 31.

[76] *Id.* at 41 ¶ 124 ("From July 25, 2022 through October 13, 2022, through the efforts of ALVA, LEFF, SKD HOLDINGS, BOOST and BENA, [JLK] entered five short term loans . . . .").

F.2d 1053, 1061 (8th Cir. 1982); *see also United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 570 (8th Cir. 1996) ("The enterprise must be distinct from the person named as the RICO defendant."). This requirement applies even if the plaintiff alleges an association-in-fact enterprise. *Jennings v. Bonus Bldg. Care, Inc.*, No. 4:13–CV–663–W–DGK, 2014 WL 1806776, at *6 (W.D. Mo. May 7, 2014) ("The [association-in-fact] enterprise must further be [4] distinct from the defendant and from the pattern of racketeering." (citing *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354–55 (8th Cir. 2011))). The "culpable persons" must be the people or entities that conduct the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) ("*[S]ome* part in directing the enterprise's affairs is required."); *see also United Food & Com. Workers Union & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–57 (7th Cir. 2013) (upholding dismissal of RICO claims because the plaintiff failed to allege that the defendants conducted the enterprise's affairs).

While a corporation can be a culpable person, a RICO plaintiff cannot subvert the requirement to plead a distinct enterprise and culpable persons by bringing a RICO cause of action against a corporation and alleging it was part of an association-in-fact enterprise consisting of itself and its officers and employees. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001) (explaining the person-enterprise distinction). "Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d

Cir. 1994). Thus, a corporation cannot generally be liable under the RICO statute for operating itself.

Despite three attempts, JLK still fails to allege culpable persons distinct from the enterprise. In JLK's second amended complaint, every single defendant is alleged to be a culpable person and part of an association-in-fact enterprise, while also serving as every other defendant's "agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer."[77] Thus, JLK has inexplicably and once again pled a "single organism" composed of actors who are somehow both controlling and being controlled by each other, which is impossible and insufficient to plead culpable persons distinct from the enterprise.

These deficiencies (i.e., (1) the failure to plead the collection of an unlawful debt and (2) failing to identify an "enterprise" that (3) is distinct from culpable persons) require the court to DISMISS JLK's RICO count WITH PREJUDICE.

## V.     Avoidance and Recovery of Preferential and Fraudulent Transfers

### A. Preferential Transfers

In counts five and eight, JLK asks the court to (1) avoid several allegedly preferential transfers of funds JLK paid to Alva under Bankruptcy Code § 547, and (2) recover the amounts allegedly transferred for the benefit of the estate under Bankruptcy Code § 550. The movants request dismissal, arguing JLK has not sufficiently pled that JLK made the transfers on account of an antecedent debt or that this count is based on due diligence and JLK's reasonable investigation of Alva's

---

[77] Second Am. Compl. 4 ¶ 10.

defenses, as § 547(b) requires.   For the reasons the court will explain below, it determines JLK sufficiently pleads it made the payments on account of an antecedent debt but does not sufficiently plead § 547(b)'s due diligence requirement. Consequently, JLK does not state a prima facie claim for the avoidance of a preferential transfer.

Under § 547(b), a chapter 11 debtor may,

> based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>     (A) on or within 90 days before the date of the filing of the petition; . . .
> (5) that enables such creditor to receive more than such creditor would receive if--
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Two of § 547(b)'s elements[78] are at issue in the motion to dismiss JLK's second amended complaint: whether JLK sufficiently pleads that it made the relevant transfers "for or on account of an antecedent debt," and whether JLK sufficiently

---

[78] In its order granting the movant's motion to dismiss JLK's first amended complaint, the court determined JLK sufficiently pled that its transfers were to or for the benefit of a creditor, made while JLK was insolvent, made within 90 days before the petition date, and that the transfers enabled Alva to receive more than it would have otherwise received in a chapter 7 liquidation. Order Granting Defs.' Mots. Dismiss and Granting Pl.'s Mot. Leave Amend 31–32, Dkt. No. 79, June 30, 2025. The court's analysis remains unchanged.   Consequently, the court incorporates by reference its prior rulings on those issues and does not repeat its analysis of those issues in this order.

pleads that its preference count is "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses." The court analyzes each in turn.

First, the MCA context requires a somewhat atypical analysis of § 547(b)'s "antecedent debt" element. Though transfers made to pay an account due or to repay loans are the more common types of transfers "for or on account of an antecedent debt" under § 547(b)(2), courts have determined transfers in satisfaction of MCA *sales* also may satisfy the antecedent debt element. *See, e.g.*, *Gecker v. LG Funding, LLC (In re Hill)*, 589 B.R. 614, 622 (Bankr. N.D. Ill. 2018) ("The fact that the transactions in this matter do not constitute loans, however, does not mean that [debtor] Network Salon did not owe a debt to LG Funding."); *Guttman v. EBF Holdings (In re Global Energy Servs., LLC)*, No. 21-17305-NVA, 2025 WL 1012721, at *9 (Bankr. D. Md. Mar. 31, 2025) (characterizing MCAs as sales but concluding trustee plausibly alleged preference count).[79] The conclusion that payments on account of MCA sales may satisfy the antecedent debt element stems from the Bankruptcy Code's expansive definitions of the terms "debt" and "claims." *Bircher v. Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.)*, No. 17-03274-5-JNC, 2019 WL 342577, at *5 (Bankr.

---

[79] The parties do not raise the issue of whether JLK's payments constitute transfers of "an interest of the debtor" in property under § 547(b) (or whether the payments are, conversely, transfers of assets already belonging to the purported purchaser). Preliminary research suggests some courts have concluded that when a debtor sells percentages of receivables (rather than specified receivables), the debtor necessarily retains a sufficient interest in the receivables sold to make subsequent payments qualify as transfers "of an interest of the debtor" under § 547(b). *See, e.g.*, *GMI Grp., Inc. v. Reliable Fast Cash, LLC (In re GMI Grp., Inc.)*, No. 19-52577-PMB, 2019 WL 3774117, at *13 n.13 (Bankr. N.D. Ga. Aug. 9, 2019) ("That limited claim by Defendant likely leaves the Debtor *some* interest in its receivables, making them property of the estate."). Because the parties do not present an argument on this question, however, the court does not presently decide the issue.

E.D.N.C. Jan. 25, 2019) ("The Bankruptcy Code does not require a court to decide whether these MCA transactions constitute 'sales' or 'loans,' just whether a 'debt' exists (or existed)."). Specifically, the Code broadly defines the term "debt" to mean "liability on a claim," 11 U.S.C. § 101(12), and the term "claim" to include rights to payment or equitable remedies for breach of performance, § 101(5). Thus, when an agreement "give[s] rise to a right to payment, through either the daily transfers, or the confessions of judgment and default fee," that "right to payment . . . gives rise to a 'claim' under the Bankruptcy Code and provides the foundation for a 'debt' for the purposes of [a preferential transfer] adversary proceeding." *In re A Goodnight Sleepstore, Inc.*, 2019 WL 342577, at *5.

In light of this authority, JLK pleads sufficient facts supporting at least one plausible reading that allows the court to draw the reasonable inference that JLK made the transfers on account of an antecedent debt. Even if the MCA agreements give rise to sales, JLK sufficiently alleges that the transactions required JLK to make ongoing payments based on a percentage of its receivables, that Alva collected those amounts, and that Alva asserted a proof of claim against JLK's bankruptcy estate. Thus, the allegations in the complaint support the reasonable inference that the MCA agreements gave rise to a right to payment that would form the foundation for a "debt" under the Bankruptcy Code. And because JLK made the payments at issue on account of the MCA agreements, those payments would also be "on account of an antecedent debt" under § 547(b)(2).

Next, § 547(b) authorizes a plaintiff to assert a preference action only if the cause of action is "based on reasonable due diligence in the circumstances of the case" and brought after "taking into account a party's known or reasonably knowable affirmative defenses." 11 U.S.C. § 547(b). The statute does not specify whether this "due diligence" and "taking into account . . . affirmative defenses" requirement is an element of a preference action that plaintiffs must allege or whether defendants must assert it as an affirmative defense. The few courts that have analyzed the issue, however, have generally concluded that the plaintiff must affirmatively plead this requirement. *See, e.g.*, *Husted v. Taggart (In re ECS Refin., Inc.)*, 625 B.R. 425, 454 (Bankr. E.D. Cal. 2020) ("[D]ue diligence and consideration of affirmative defenses, is an element of the trustee's prima facie case." (citation omitted)); *In re Pinktoe Tarantula Ltd.*, No. 18-10344 (LSS), 2023 WL 2960894, at *5 (Bankr. D. Del. Apr. 14, 2023) (collecting cases and determining "the due diligence requirement is an element of a preference claim, not an affirmative defense"). For the reasons explained in *In re Pinktoe Tarantula Ltd.*, the court determines that the structure and language of § 547 make this requirement a condition precedent and an element of a preference action. *Id.* Consequently, JLK may only survive dismissal of this count if it affirmatively pleads § 547(b)'s "due diligence" and "taking into account . . . affirmative defenses" requirement by, at a minimum, making some allegations concerning JLK's consideration of the movants' likely defenses. *Rebein v. NutriQuest, LLC (In re Sandy Road Farms, LLC)*, Case No. 24-40446, Adv. No. 25-7001, 2025 WL 2990836, at *3–4 (Bankr. D. Kan. Oct. 22, 2025).

JLK, however, does not plead the "due diligence" and "taking into account . . . affirmative defenses" requirement. In its response in opposition to the motion to dismiss, JLK appears to argue that it "covered" Alva's "potential affirmative defenses" by making conclusory allegations that those defenses are unavailable.[80] JLK further states for the first time in its response in opposition that it analyzed its transactions with Alva and identified "the amount of [the] preferential treatment."[81] JLK's conclusory statements concerning Alva's defenses and subsequent argument concerning its analysis of the transactions and preferential treatment, however, are misfocused. Section 547(b) requires, at a minimum, some affirmative statements concerning JLK's *investigation* of the *defenses*—not conclusions concerning availability of the defenses or JLK's investigation of the overall effect of the transfers. The complaint is devoid of any allegations that the court could reasonably interpret as pleading that JLK engaged in due diligence or the steps JLK took to assess the defendants' affirmative defenses. Consequently, JLK does not state a prima facie claim for avoidance and recovery of preferential transfers.

Because JLK has not sufficiently alleged the due diligence requirement under 11 U.S.C. § 547(b), it also has not sufficiently pled a cause of action to recover any preferential transfers under 11 U.S.C. § 550. Accordingly, the court DISMISSES JLK's counts to avoid and recover preferential transfers WITHOUT PREJUDICE.

## B. Fraudulent Transfers

In counts five, six, seven, and eight, JLK asks the court to avoid and recover

---

[80] JLK's Opp'n Mot. Dismiss 28.
[81] *Id.* at 29.

transfers it allegedly made to Alva[82] under theories of constructive fraud. JLK premises its requests on two categories of avoidance statutes governing avoidance of constructively fraudulent transfers: (1) § 548 of the Bankruptcy Code, which permits a debtor-in-possession to avoid transfers under federal bankruptcy law; and (2) § 544 of the Bankruptcy Code, which permits a debtor-in-possession to avoid transfers under relevant state law—here either § 428.024 of the Missouri Uniform Fraudulent Transfer Act (MUFTA) or § 726.105 of the Florida Uniform Fraudulent Transfer Act (FUFTA). JLK also seeks recovery of any avoided transfers under Bankruptcy Code § 550.

The movants argue that JLK does not sufficiently plead a lack of reasonably equivalent value, primarily because JLK focuses its allegations on the inequivalence of the value JLK would have received if the MCA transactions had given rise to usurious loans (a characterization the movants oppose). As the court explains below, it agrees with the movants that JLK does not sufficiently allege a lack of reasonably equivalent value.

A debtor-in-possession may avoid constructively fraudulent transfers under both § 548(a)(1)(A) of the Bankruptcy Code and under state law. 11 U.S.C. § 548(a)(1)(A) (authorizing trustee to avoid fraudulent transfers); 11 U.S.C. § 544(b)(1) (authorizing trustee to avoid any transfer that would otherwise be voidable by a creditor under applicable law). Many of the elements of a fraudulent

---

[82] For the third time, JLK does not specify which defendant it asserts count seven against. The court, however, understands from briefs, oral argument, and the history of JLK's adversary complaints that JLK intends to assert count seven against Alva only. Consequently, the court analyzes the sufficiency of count seven with respect to movant Alva.

transfer cause of action are the same under federal bankruptcy law and the state laws that apply in this case—the MUFTA and the FUFTA.  Specifically, § 548 of the Bankruptcy Code, §§ 428.024.1(2) and 428.029.1 of the MUFTA, and § 726.105(1)(b) of the FUFTA each impose five elements: the debtor (1) had a property interest; (2) transferred that interest; (3) made the transfer within a specified limitations period— two years under § 548 of the Bankruptcy Code and four years under the MUFTA and the FUFTA; (4) received less than reasonably equivalent value for the transfer; and (5) acted under circumstances that demonstrate at least one additional indicium of constructive fraud.  11 U.S.C. § 548(a)(1); Mo. Rev. Stat. §§ 428.024.1(2), 428.029.1, 428.049; Fla. Stat. §§ 726.105(1)(b), 726.110.

In its prior order dismissing JLK's first amended complaint, the court discussed in detail the fraudulent transfer elements and determined JLK sufficiently pled all elements except reasonably equivalent value.[83]  Because JLK has not meaningfully altered its pleading of the elements other than reasonably equivalent value, the court incorporates by reference and adopts the analysis of those other elements from its order dismissing the first amended complaint.[84]  As to the reasonably equivalent value element, however, JLK adds several paragraphs that JLK argues now satisfy the pleading requirements.  In light of those changes, the court analyzes reasonably equivalent value below.

A plaintiff sufficiently pleads lack of reasonably equivalent value if it plausibly

---

[83] Order Granting Defs.' Mots. Dismiss and Granting Pl.'s Mot. Leave Amend 35–37, Dkt. No. 79, June 30, 2025.
[84] *Id.* at 36–37.

alleges that the value a debtor received in a transfer was not "substantially comparable" in worth to the value the debtor gave. *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994). When the lack of reasonable equivalence is premised on the proposition that a debtor obtained financing above the market rate in a specific market, general allegations that the amount paid was above market do not suffice. *See Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 (8th Cir. 2018) (concluding an unsupported allegation that the interest rate debtor received was above the market rate did not satisfy the plaintiff's burden to plead lack of reasonably equivalent value for the repayment of similar financing arrangements in the debtor's specific market).

Despite the allegations JLK added in the second amended complaint, JLK's pleading of lack of reasonably equivalent value again falls short. The allegations that arguably support the inference that JLK did not receive reasonably equivalent value include the allegations supporting JLK's argument that the transactions are unenforceable as disguised usurious loans[85] and the allegations that JLK tendered $498,691 more than it received.[86] But as the court explained in the portion of this order determining JLK does not sufficiently plead its count for declaratory relief,[87] JLK has not sufficiently pled that the transactions are loans. And JLK does not make sufficient allegations from which the court could reasonably infer the value of what

---

[85] Second Am. Compl. 66–71 ¶¶ 192–201.

[86] *Id.* at 73–74 ¶ 206 ("[T]he difference in value between what [JLK] tendered ($970,681) and what ALVA tendered to ALVA ($471,990) is the sum of $498,691, which is more than twice the value of what [JLK] tendered, establishing a lack of equivalent value, even considering the transactions were loans.").

[87] *See supra* Part I.

JLK received based on the market available to businesses seeking an immediate cash infusion (such as by alleging, for example, the available market for loan to similarly situated borrowers or factoring arrangements). JLK, therefore, does not sufficiently plead lack of reasonably equivalent value.

Because JLK does not sufficiently plead lack of reasonably equivalent value, the court DISMISSES JLK's counts to avoid and recover the allegedly fraudulent transfers. Although JLK has now failed for the third time to plead lack of reasonably equivalent value, its failure is at least in part due to its repeated characterization of the transactions as loans. Because the court has now rejected that characterization and dismissed JLK's declaratory relief count with prejudice, JLK's theory must change. Consequently, the court will give JLK the opportunity to plead that it did not receive reasonably equivalent value for transactions that are not loans. The court dismisses this count WITHOUT PREJUDICE.

## VI.   Claim Objections

In counts nine and ten, JLK objects to Alva's claim against JLK's bankruptcy estate, Proof of Claim No. 3, under § 502(d) and (b)(1), respectively. Rule 3007 of the Federal Rules of Bankruptcy Procedure allows a debtor to object to a defendant's claim in an adversary proceeding. Fed. R. Bankr. P. 3007(b). An adversary proceeding seeking disallowance of a claim is vulnerable to the defendant's request for dismissal under Rule 12(b)(6). *See generally In re Hardaway*, 421 B.R. 226 (Bankr. N.D. Miss. 2010) (applying Rules 12(b)(1) and 12(b)(6) to claim objections brought as adversary proceedings under Rule 3007(b)). The court applies these standards below

and, for the reasons the court will explain, DISMISSES counts nine and ten.

## A.    Disallowance of Claim under § 502(d)

In count nine, JLK asks the court to disallow Alva's claim under 11 U.S.C. § 502(d) because Alva is liable to the estate for the recovery of avoidable transfers.

Section 502(d) of the Bankruptcy Code requires courts to "disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title."  11 U.S.C. § 502(d).  But "the court may only use section 502(d) to disallow a claim if the entity is first adjudged liable under the applicable section."  *In re Midwest Agri Dev. Corp.*, 387 B.R. 580, 586 (B.A.P. 8th Cir. 2008).

Here, for the reasons the court previously explained, JLK has not plausibly pled that Alva is the recipient of an avoidable preferential or fraudulent transfer under §§ 547 or 548 or that Alva's property is recoverable under § 550.[88] Consequently, § 502(d) is not available as a mechanism for JLK to object to Alva's proof of claim.  Because the court dismissed JLK's counts for avoidance and recovery of preferential and fraudulent transfers without prejudice, the court also DISMISSES count nine WITHOUT PREJUDICE.

## B.    Objection to Claim

Finally, in count ten, JLK asks the court to disallow Alva's Proof of Claim No. 3 and seeks a judgment sustaining its objection to the claim.  JLK alleges Alva's claim

---

[88] *See supra* Part V.

is unenforceable pursuant to 11 U.S.C. § 502(b)(1) because the transaction was *void ab initio* as a usurious loan under Florida law.  Section 502(b)(1) disallows any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  11 U.S.C. § 502(b)(1); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007).

As previously discussed in the declaratory relief and usury sections,[89] JLK fails to sufficiently plead the existence of usurious loans.  Because JLK has not and cannot adequately plead that the transactions were usurious loans, the court DISMISSES JLK's count ten WITH PREJUDICE.

## LEAVE TO AMEND

The court has discretion to grant or deny a party's request for leave to amend.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Though courts liberally permit plaintiffs to amend their complaints, the right to amend is not absolute.  *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989).  "[D]ismissal with prejudice is typically appropriate when a plaintiff has shown 'persistent pleading failures' despite one or more opportunities to amend."  *Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1080 (D. Minn. 2021) (citations omitted).  The party seeking leave to amend must demonstrate that "amendment would be able to save an otherwise meritless claim."  *Jackson v. Riebold*, 815 F.3d 1114, 1122 (8th Cir. 2016) (quoting *Plymouth Cnty. v. Merscorp, Inc.,* 774 F.3d 1155, 1160 (8th Cir. 2014)).  If the court determines that amendment

---

[89] *See supra* Parts I–II.

would be futile, then it should deny the plaintiff's request to amend. *Id.* (citing *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009)). Amendment is futile when a plaintiff does not adequately address the court's prior rejection of the plaintiff's theories, *Anderson v. Bank of the W.*, 23 F.4th 1056, 1061 (8th Cir. 2022), and when the plaintiff fails to submit a proposed amended complaint or otherwise clarify what a sufficiently pled complaint would contain, *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 782 (8th Cir. 2009).

In this case, the court determines amendment of JLK's counts for declaratory relief (count one), usury (count two), fraud (count three), RICO (count four), and claim objection premised on JLK's theory that the claim is for a usurious loan (count ten) would be futile. JLK's declaratory relief, fraud, and RICO counts are premised on theories that are not viable for the reasons the court explained in the substantive sections that analyze those counts above.[90] JLK has not been able to articulate viable theories under those counts despite having three opportunities to do so. Moreover, JLK has not explained how an amendment would save those otherwise meritless claims and has not submitted a proposed amendment that would address the court's rejection of JLK's theories. Consequently, amendment of those counts would be futile. And because JLK's usury count and claim objection in count ten are both premised on the non-viable theory that the MCA agreements gave rise to usurious loans, amendment of those counts would also be futile. Consequently, the court DISMISSES JLK's counts for declaratory relief (count one), usury (count two), fraud

---

[90] *See supra* Parts I, III–IV.

(count three), RICO (count four),[91] and claim objection premised on JLK's theory that the claim is for a usurious loan (count ten) WITH PREJUDICE.

The court, however, is not convinced that amendment of counts five through nine would be futile.  Though JLK has failed to cure the defects the court identified in its prior orders dismissing those counts, the court attributes JLK's failure at least in part to JLK's ongoing efforts to persuade the court that the MCA agreements gave rise to usurious loans.  But the recharacterization of the MCA agreements as loans is not a necessary prerequisite to JLK's counts for avoidance and recovery of preferential and fraudulent transfers (counts five through eight) or its claim objection premised on Alva's purported avoidance liability (count nine).  Because the court now dismisses with prejudice JLK's counts to recharacterize the MCA agreements, JLK's theory must change.  To allow JLK to plead the avoidance counts based on viable constructions of the MCA agreements, the court DISMISSES counts five through nine WITHOUT PREJUDICE.  Accordingly, the court GRANTS JLK's request for leave to amend counts five through nine.

## CONCLUSION

For the reasons explained above, the court GRANTS the movants' motions to dismiss all counts and GRANTS JLK's request for leave to amend counts five through nine. The court DENIES JLK's motion for leave to amend all other counts and

---

[91] In addition to the fact that an amendment to JLK's RICO count would be futile, dismissal with prejudice is further justified because "[c]ivil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991). Thus, courts are encouraged to dispose of frivolous RICO causes of action at early stages of litigation. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (citations omitted).

DISMISSES those counts WITH PREJUDICE.  JLK may file an amended complaint
on or before January 20, 2026.  The defendants will have until February 20, 2026, to
file an answer or responsive pleading.

It is so ordered.

Dated: 12/18/2025                     /s/ Brian T. Fenimore
                                      United States Bankruptcy Judge